**WESTERN SURETY COMPANY,**
**Plaintiff and Appellee**

v.

**FIRST BANK OF SOUTH DAKOTA,**
**N.A., Defendant and Appellant**

**and**

**Terry Sampson, Receiver of Clair F.**
**Wieseler and Terry Sampson,**
**individually, Defendants.**

**Nos. 16035, 16092.**

Supreme Court of South Dakota.

Argued May 23, 1988.

Decided Aug. 17, 1988.

Robert L. Varilek, Rapid City, for plaintiff and appellee.

Donald R. Shultz of Lynn, Jackson, Shultz & Lebrun, P.C., Rapid City, for defendant and appellant.

WUEST, Chief Justice.

This is an appeal from a judgment in favor of Western Surety Company (Western Surety), appellee, against First Bank of South Dakota (First Bank), appellant. We reverse.

On September 2, 1983, First Bank established a revolving line of credit in favor of

Clair Wieseler (Wieseler), up to the sum of $1,000,000. The balance due under this line of credit was payable on July 5, 1984, and was secured by Wieseler's assets, including funds on deposit in accounts Wieseler held at First Bank. The note underlying the debt expressly stated that Wieseler agreed "[t]hat when or at any time after this Note becomes due the holder hereof may without notice ... charge this Note against any bank account ... then maintained ... with the holder...." On July 5, 1984, the unpaid balance due on the note exceeded $200,000. Wieseler also owed First Bank substantial sums on other notes not in issue.

Wieseler was appointed guardian of the person and estate of Peter A. Kaiser on January 13, 1984. Western Surety posted a guardianship fidelity bond with Wieseler as principal.

On May 28, 1984, Wieseler issued a check drawn on the Peter A. Kaiser Guardianship account in a Wyoming bank in the amount of $28,760.57. The check was issued without court approval. Wieseler issued a second check on July 24, 1984, in the amount of $50,000. Both checks were made payable to Wieseler and deposited in his personal checking account at First Bank in Rapid City, South Dakota. The origination of the funds as money from the Kaiser guardianship account was noted on each of First Bank's deposit slips.[1] The checks themselves also indicated that they were drawn on a guardianship account and contained memos listing the purposes of the payments to Wieseler—one for reimbursement of expenses and the other for an oil and gas investment.

A pending divorce and the precarious nature of Wieseler's financial situation led to the establishment of a court-approved marital receivership. On August 3, 1984, Terry Sampson (Sampson), was appointed receiver for Wieseler and took immediate control of all assets and liabilities. David Gaddie (Gaddie), a senior vice-president of First Bank, and Ron Brue, president of First Bank, participated in the discussions leading to the appointment of Sampson as receiver of Wieseler's assets and liabilities. Gaddie, therefore, knew that Sampson's formal appointment as receiver was immediately effective.

On August 7, 1984, Wieseler called Gaddie and requested that he apply funds held in Wieseler's checking account to his debt with First Bank under the note. Thereafter, First Bank applied a total of $246,-460.84 from Wieseler's account against his secured debt.

Four months after First Bank applied Wieseler's bank account containing the deposits from the Kaiser guardianship account to the overdue note, a Wyoming guardianship court disapproved the checks. No evidence indicates that First Bank knew Wieseler had wrongfully appropriated the two checks from the guardianship account when it applied the funds to the note.

On November 6, 1984, and again on December 6, 1984, Western Surety was advised of a potential claim on its bond for Wieseler. Formal demand for payment on the bond was made by Stockmen's Bank and Trust Company on January 4, 1985, after it was appointed successor-guardian for Kaiser.[2] Upon receipt of the demand for payment, Western Surety advised Wieseler of its intent to claim reimbursement for expenditures under its bond against him personally.

In addition to a claim on the bond, Kaiser's successor-guardian obtained judgments against Wieseler and Western Surety for the amount of the two checks. Western Surety paid the amounts due under the judgment.

Sampson, as Wieseler's receiver and as Wieseler's successor-guardian for Kaiser, never requested that First Bank reimburse or pay the amount of the Kaiser checks deposited in Wieseler's account. Sampson never demanded that First Bank or other judgment creditors pay Western Surety, and never took steps to recoup the alleged Kaiser funds from First Bank on the theo-

1. The notation consisted of the name "Kaiser."

2. Stockmen's Bank and Trust in Gillette, Wyoming succeeded Sampson as Kaiser's guardian.

ry these funds were among the sums ultimately applied by First Bank to Wieseler's debt on August 7, 1984.

This action commenced with Western Surety's suit against Sampson, as Wieseler's receiver, to recover amounts it paid to Kaiser's successor-guardian pursuant to its fidelity bond with its principal, Wieseler. Western Surety later joined First Bank by amended complaint.

In its decision, the trial court held that First Bank could not retain the funds from the Kaiser guardianship account. In essence, the trial court applied a constructive trust theory of recovery in favor of Kaiser's guardian which Western Surety could exercise by subrogation.

First Bank argues on appeal that Western Surety was statutorily prohibited from bringing a direct claim against First Bank and that Western Surety could only seek recovery from its principal, Wieseler, or the receiver. In the alternative, First Bank argues that Western Surety had no subrogation claim against First Bank, and, even if it did, Western Surety waived its claim against First Bank.

First Bank relies upon SDCL 56–2–14 and our decision in *City of Lemmon v. U.S. Fidelity & Guaranty Co.*, 293 N.W.2d 433 (S.D. 1980). SDCL 56–2–14 provides:

> If a surety satisfies the principal obligation or any part thereof, whether with or without legal proceedings, the principal is bound to reimburse what he has disbursed including necessary costs and expenses, *but the surety has no claim for reimbursement against other persons, though they may have benefited by his act,....* (Emphasis supplied).

In *City of Lemmon*, the city sued a general contractor, a project engineer, and other subcontractors, as well as a project surety for defects in a swimming pool project. The surety paid on its bond and then cross-claimed against the project engineer and a soil testing firm for alleged negligence. We said:

> We believe [SDCL 56–2–14] means precisely what it says. USFG, having paid the full amount of its performance bond plus interest, may look to Wells, the principal, for reimbursement, but no further. It is incumbent upon a surety to acquire sufficient security and collateral from its principal, or be convinced of its principal's continued solvency, so that if payment on the bond is necessary, the surety may recoup its expenditure from the principal.

> \*   \*   \*   \*   \*   \*

> Likewise, SDCL 56–2–14 precludes USFG as a surety from being subrogated to any of Mrs. Wells' rights against SPN and SEC. The plain meaning of SDCL 56–2–14 is that USFG may not be involved in litigation against SPN and SEC, regardless of the legal theory upon which it may choose to bring suit. We will not use the equitable theory of subrogation to defeat this statute.

293 N.W.2d at 438, 439.

■ Subsequent to our decision in *City of Lemmon*, the South Dakota legislature adopted SDCL 56–2–17 [3] which provides for limited rights of subrogation. SDCL 56–2–17(3) subrogates a surety to the "rights of the creditor against persons other than the principal whose negligence, willful conduct or breach of contract has made them liable to the creditor for the same default, loss or damage."

> (3) The rights of the creditor against persons other than the principal whose negligence, willful conduct or breach of contract has made them liable to the creditor for the same default, loss or damage; and
> (4) The rights of the creditor against co-sureties and to the creditor's interest in security held by them, but in such case the co-surety's personal liability is limited to the amount which will satisfy his duty to contribute his share of the principal's default.

**3.** SDCL 56–2–17 provides:
   If the duty of the principal to the creditor is fully satisfied, the surety, to the extent that he has contributed to this satisfaction, is subrogated to all of the following:
   (1) The rights of the creditor against the principal;
   (2) Subject to the rule stated in subdivision (4) of this section, the interests which the creditor has in security for the principal's performance and in which the creditor has no continuing interest;

SDCL 56–2–17(3) does not apply to the case at bar because there is no evidence showing negligence, willful conduct, or a breach of contract on the part of First Bank. Clearly, the other provisions of SDCL 56–2–17 are likewise inapplicable.

In this case, the evidence shows that First Bank applied Wieseler's checking account funds to his debt in August, 1984. At that time, First Bank had no reason to doubt Wieseler's ownership of the total amount in his account. The checks and deposit slips relating to the Kaiser guardianship account did not disclose whether Wieseler received the funds "as guardian" or as a trustee. Thereafter, First Bank changed its position in reliance on Wieseler's ownership of the funds. It obtained a judgment for an amount of debt, crediting the full amount of the August 7, 1984 payment.

We are not unmindful that the trial court entered findings of fact to the effect that First Bank knew that neither it nor Wieseler, nor Sampson had ownership of the funds transferred, and that prior to the appointment of Sampson, First Bank knew of the Kaiser guardianship and Wieseler's role as the guardian and fiduciary of Kaiser's person and estate. Since there is no evidence in the record to support these findings of fact, we regard them as clearly erroneous.

■ Western Surety claims First Bank could not transfer the funds on the instructions of Wieseler because a receiver had been appointed for him, thereby relinquishing him of control over his account. We, however, observe that the terms of the note allowed First Bank to charge without notice the note against any account maintained by Wieseler. Furthermore, First Bank had a lien under the provisions of SDCL 44–11–11.[4] When the bank applied the account to the note, it could hardly foresee that four months later a Wyoming guardianship court would disapprove the checks. We make this observation because Western Surety urges that First Bank was

negligent or guilty of willful conduct when the transfer was made, thereby subrogating Western Surety under the provisions of SDCL 56–2–17(3).

Our decision in *City of Lemmon* is controlling. We, therefore, hold that because the evidence does not show negligence or willful conduct on the part of the First Bank, Western Surety is not subrogated.

Reversed.

All the Justices concur.

---

4. SDCL 44–11–11 provides:
   A bank or savings and loan association has a general lien, dependent on possession, upon all property in its hands belonging to a customer, for the balance due to it from such customer in the course of business.